## CIRCUIT COURT OF THE CITY OF RICHMOND

Conard B. Mattox, Jr.,
Adm'r d.b.n., c.t.a., etc.

v.

Annabella R. Jenkins
Foundation et al.

May 6, 2003

Case No. HN-620-4

BY JUDGE RANDALL G. JOHNSON

In this suit for aid and guidance, the court must decide whether The Annabella R. Jenkins Foundation ("Jenkins Foundation" or "Foundation") and The Sheltering Arms Hospital ("Sheltering Arms") are the proper beneficiaries of two charitable trusts created under the will of Joseph E. Wigington. All of the material facts have been stipulated to by the parties. Oral argument was heard on April 22.

Joseph E. Wigington executed his will on June 21, 1974. On June 18, 1978, he executed a codicil, the only provision of which was to express his intent that the document executed on June 21, 1974, was his will and that all other wills and codicils were revoked. Under the will, Wigington created the Joseph E. Wigington Trust, which was made up of 14 separate parts, designated Funds A through N. The beneficiaries of Funds D through N were individuals, each of whom was to receive the income from his or her fund, payable at least annually, for life. When the beneficiary of one of those funds died, the property in such fund was to be paid to Funds A, B, and C.

With regard to Funds A, B, and C, the will provided that the income attributable to those funds was to be distributed each year as follows:

*Fund A*

> Sheltering Arms Hospital, Richmond, Virginia, for the operation and maintenance of this institution to provide relief of the human suffering for those unable to care for the same.

*Fund B*

> Retreat For The Sick Hospital, Richmond, Virginia, for its operation and maintenance of the services of this hospital to give relief of the human suffering for those unable to provide for themselves.

*Fund C*

> For worthy, qualifying, charitable and educational purposes for citizens of the City of Richmond, Virginia, after the same has been approved by the Trustee without regard to race, creed, or color being considered in paying out the money to those deserving of its help.[1]

Wigington died on November 26, 1981. In 1983, Conard B. Mattox, Jr., administrator d.b.n., c.t.a. of the estate and substitute trustee of the trust, filed a suit for aid and guidance in this court. Among the provisions of the decree that was entered in that action on March 9, 1984, was a finding that each of the funds created by the will was a separate trust and that Funds A, B, and C were to be funded equally.

Mattox filed the present action on March 27, 2000. In it, he seeks to have the court rule that Sheltering Arms is no longer entitled to receive the benefit of Fund A and that the Jenkins Foundation, as the purported successor to The Retreat for the Sick Hospital, is no longer entitled to receive the benefit of Fund B. For the reasons that follow, the court rejects Mattox' arguments with regard to Sheltering Arms but agrees that the Jenkins Foundation is not a proper beneficiary.

---

[1] All of the parties' arguments assume that the phrases "those unable to care for the same," "those unable to provide for themselves," and "those deserving of its help" refer to indigent persons. The court agrees with that interpretation.

*Sheltering Arms Hospital*

For more than ninety years prior to 1980, Sheltering Arms operated as an acute general care hospital. Since January 4, 1981, it has operated as a physical rehabilitation hospital. When it was an acute general care hospital, Sheltering Arms did not send bills to any of its patients. As a rehabilitation hospital, Sheltering Arms sends bills to a large number of its patients. The hospital currently admits patients who, in its judgment, will benefit from rehabilitative care, regardless of whether such patients are able to pay for it. Free care or care at a reduced charge is provided to those patients who demonstrate that they have a financial need for such assistance. In recent years, the aggregate financial assistance provided by Sheltering Arms has been between $500,000 and $1,000,000 per year.

The Joseph E. Wigington Trust has paid to Sheltering Arms $30,950.80 for the period from Wigington's death through December 31, 1991; $2,391.95 for calendar year 1992; $7,787.58 for calendar year 1993; $2,452.40 for calendar year 1994; and $2,834.13 for calendar year 1995. It has not made any other distributions to Sheltering Arms. The funds received from the trust were placed in a reserve account of the Sheltering Arms Foundation, which distributes funds from the reserve account to Sheltering Arms Hospital. In some fiscal years, not all funds that are received by the foundation as donations and income from trusts administered by third parties are distributed to the hospital, but, over time, the aggregate distributions substantially exceed the aggregate receipts, and the aggregate distributions made by the foundation to the hospital for the six fiscal years ending on September 30, 1997, were substantially in excess of the aggregate amount of funds that had been placed in the foundation's reserve account as a result of donations to the hospital and income received from trusts administered by third parties. As of February 28, 2003, Fund A was valued at $123,932.

Mattox takes the position that Sheltering Arms as it now exists is not the same Sheltering Arms that existed when Wigington executed his will. Thus, according to Mattox, it is no longer entitled to the benefit of Fund A. In support of that position, Mattox points to two facts. First, when Wigington executed his will in 1974, Sheltering Arms was an acute general care hospital, and not a rehabilitation hospital as it is now. Second, when Wigington executed his will, Sheltering Arms did not bill any of its patients. Now, it bills a large number of its patients. Mattox then argues that, since there is no indication that Wigington knew of Sheltering Arms' conversion to a rehabilitation hospital before he died, his intent must be determined as of the date he executed his will. Mattox' argument is without merit.

In Virginia, a will speaks as of the date of the testator's death, not the date of the will's execution. Virginia Code § 64.1-62 specifically provides:

> A will shall be construed, with reference to the real and personal estate comprised in it, to speak and take effect as if it had been executed immediately before the death of the testator, unless a contrary intention shall appear by the will.

No contrary intention appears in Wigington's will. On November 26, 1981, the date Wigington died, Sheltering Arms was a rehabilitation hospital. The fact that it was previously an acute care hospital makes no difference. In fact, the only mention anywhere in the case file about "acute care" or "acute care hospital" are Mattox' repeated references to those terms in his written submissions. Such terms do not appear in the will. The will simply establishes Fund A for "Sheltering Arms Hospital, Richmond, Virginia, for the operation and maintenance of the services of this institution to provide relief of the human suffering for those unable to care for the same." If Wigington had intended that Sheltering Arms be the beneficiary of Fund A only if it were an acute general care hospital, he could have easily added such a provision to his will. He did not.

By the same token, the fact that Sheltering Arms now bills a large number of its patients also does not disqualify it from receiving the benefit of Fund A. As noted earlier, while the Wigington Trust paid Sheltering Arms no more than $8,000 per year during the years in which any money was paid at all, Sheltering Arms spends between $500,000 and $1,000,000 per year in financial assistance to indigent persons. The will provides that Fund A be used by Sheltering Arms to treat indigent persons. *See* n. 1, *supra*. It does not require that Sheltering Arms *only* treat indigent persons.

The court finds that Sheltering Arms Hospital was, and is, the proper beneficiary of Fund A of the Joseph E. Wigington Trust. At all times relevant to this action, both before and after its conversion, Sheltering Arms has been an "institution" that provides "relief of the human suffering" for those "unable to care for the same." Its conversion from an acute general care hospital to a rehabilitation hospital did nothing to alter that fact. Mattox' arguments to the contrary have no basis in fact or law and are rejected.

### The Annabella R. Jenkins Foundation

The situation with regard to the Jenkins Foundation is different. As was true with Fund A and Sheltering Arms, Fund — was established for "Retreat

for the Sick Hospital, Richmond, Virginia, for its operation and maintenance of the services of this hospital to give relief of the human suffering for those unable to provide for themselves."[2] When Wigington died, Retreat operated a 227-bed hospital that provided acute medical services to the indigent at no charge. The Retreat Health Systems, Inc., was the sole member of Retreat Hospital and operated as the parent entity of the hospital and its affiliates. In June 1995, Retreat Hospital sold its operating assets to Columbia/HCA Health Care Corporation, a for-profit company. The asset purchase agreement provided that gifts and bequests intended for the "original" Retreat Hospital, such as the Wigington Trust, would remain with the original Retreat and its affiliates, and would not pass to Columbia/HCA, which continues to operate a hospital in Richmond known as "Retreat Hospital."[3]

On August 1, 1995, The Retreat Health Systems, Inc., amended and restated its articles of incorporation, which, among other things, changed the name of The Retreat Health Systems, Inc., to The Annabella R. Jenkins Foundation, Annabella R. Jenkins having been the founder of Retreat Hospital. Retreat Hospital filed articles of dissolution with the State Corporation Commission, which were approved on June 24, 1996. Retreat Hospital never filed articles of termination of corporate existence.

On December 9, 1999, Retreat revoked its articles of dissolution and, on the same day, filed articles of merger with the Jenkins Foundation. The State Corporation Commission approved the merger effective December 14, 1999, the certificate of merger stating that "The Retreat Hospital, a Virginia corporation, was merged into Annabella R. Jenkins Foundation, a Virginia corporation, and the surviving corporation, under the name of Annabella R. Jenkins Foundation, succeeded to the ownership of the property of The Retreat Hospital."

The amended and restated articles of incorporation of the Jenkins Foundation set out the Foundation's purposes. Relevant to the issues before the court is the following:

---

[2] "Retreat for the Sick Hospital" had changed its name to "Retreat Hospital" two years before Wigington executed his will. That change has no bearing on any of the issues in this action.

[3] Because of the asset purchase agreement, and because the present "Retreat Hospital" is not a charitable organization under federal and state law, which is a requirement for the beneficiary of Fund B under the will, Columbia/HCA and the present "Retreat Hospital" are not parties to this action. For the remainder of this opinion, the terms "Retreat Hospital" and "Retreat" refer to the "original" Retreat Hospital, not the one currently operated by Columbia/HCA.

The Foundation is organized exclusively for charitable, educational, scientific, and health-related purposes, including without limitation the making of distributions for such purposes and to organizations that qualify as exempt organizations under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended. . . . Without limiting or expanding the foregoing, one of the purposes of the Foundation is to provide support for (i) the medically indigent patient, (ii) community medical outreach programs, (iii) hospice patients and their families, and (iv) community health care education programs.

The Jenkins Foundation does not operate a hospital or other health care facility. Instead, it makes grants in the health care area pursuant to its guidelines to (1) programs that provide medical and health services to the medically indigent; (2) quality health care and related medical programs in the Richmond metropolitan area; (3) nonprofit medical and health programs; and (4) health care education. Since its grant-making began in 1996, the Foundation has awarded 74% of its total grant dollars in the category of access to health care services for the uninsured and "underserved." Among those grants was a commitment of $1.3 million to a collaborative health care delivery system between Virginia Commonwealth University/Medical College of Virginia Hospitals and the Richmond City Department of Public Health to meet the specific needs of the city's uninsured and underinsured patient population. The Foundation also provides important operating or staff support to community-based free health clinics such as Cross Over Ministries, Fan Free Clinic, and Irvin Gammon Craig Health Center. In spite of such obviously charitable and beneficial works on the part of the Jenkins Foundation, including assistance to indigent persons in need of medical treatment, the court must hold that the Foundation is not a proper beneficiary of the Wigington Trust.

The language creating Fund B is clear and unambiguous. Fund B is for Retreat Hospital "for its *operation and maintenance of the services of this hospital* to give relief of the human suffering for those unable to provide for themselves." Emphasis added. The fund was not established just to help indigent persons, something the Jenkins Foundation unquestionably does. That was the purpose of Fund C. Fund B, like Fund A, was established for the specific purpose of supporting the operation of a hospital. Since the Jenkins Foundation does not operate a hospital, it is not entitled to receive any money from Fund B.

In making this ruling, the court has considered all of the arguments made by the Jenkins Foundation as to why it should be the beneficiary of Fund B. Those arguments are not persuasive. First, the Foundation argues that Retreat Hospital is still in existence even though it was merged into the Jenkins Foundation. While the court disagrees with the Foundation in this regard, even if Retreat Hospital's existence did survive the merger, it no longer operates a hospital. It was not Wigington's intent simply to give money to Retreat Hospital. It was his intent to give money to Retreat Hospital to operate and maintain a hospital. Neither Retreat nor the Jenkins Foundation does that.

Second, the Foundation argues that, even if Retreat Hospital no longer exists, the Foundation is the proper beneficiary of Fund B as the surviving corporation to the merger. This, according to the Foundation, is based on the "well established principle in the area of charitable trust law that, if property is given in trust to be applied for the support of a particular charitable institution and the institution subsequently merges with another institution established for similar purposes, the application of the trust property for the new institution is proper unless the settlor manifested an intention to restrict the trust property solely for the named institution." Reply Memorandum of Annabella R. Jenkins Foundation, at 5. The Foundation cites *Restatement (Second) of Trusts* § 399, Comment o, at 305-06 (1959), and IV A *Scott on Trusts*, § 397.3 at 422 (1989), in support of that argument. Again, however, the Foundation's argument misses the point. Wigington did not establish a trust for Retreat Hospital that Retreat could use as it saw fit and which might, under appropriate circumstances, be transferred to a successor entity. Wigington established a trust for Retreat Hospital that Retreat could only use to operate and maintain a hospital. If Retreat could not receive the benefit of the trust without operating and maintaining a hospital, neither can its successor.

Third, the Foundation argues that this court's decrees in two other cases require the court to now find that the Foundation is the proper beneficiary of Fund B. In *NationsBank v. Mary Baldwin College*, Case No. HJ-565-3 (decree entered September 24, 1998), the trustee of a charitable trust sought aid and guidance with regard to funds designated for Retreat Hospital under the will of Charles Fletcher Cole, deceased, in light of the fact that Retreat was merging into the Jenkins Foundation. In *Annabella R. Jenkins Foundation v. NationsBank*, Case No. HH-774-4 (decree entered July 1, 1997), the Foundation and Retreat filed a bill of complaint to confirm that funds designated for Retreat under a trust created by the joint will of Isaac and Helen T. Davenport, both deceased, would be paid to the Foundation upon the merger of Retreat and the Foundation or upon the dissolution of Retreat and

transfer of Retreat's assets to the Foundation. In both cases, this court held that the Jenkins Foundation was the proper successor to Retreat for the purpose of receiving funds under the wills and trusts in question. Those holdings are not applicable here.

First, the decision in the case-at-bar is not based on whether the Jenkins Foundation is the rightful successor to Retreat Hospital generally, but on the specific language of Wigington's will. The language of the other wills was different. The Cole will, which was not included in the parties' stipulations but which is part of the record in Case No. HJ-565-3, gave 10% of a trust to Retreat Hospital with no conditions placed on its use. And although the funds in the Davenport will were designated for "The Retreat for the Sick, of the City of Richmond, Va., *for its charity wards* for both white and colored patients" (emphasis added), that language is not quite as commanding as Wigington's language that Fund B be used for Retreat's "operation and maintenance of the service *of this hospital*." Emphasis added.

More importantly, as Mattox points out in his reply memorandum, the cases cited above appear to have been "friendly" actions in which all of the parties agreed to the resolution of the questions presented. Mattox was not a party. Neither he nor the Wigington trust can be bound by those decrees. *See, e.g., Scales v. Lewis*, 261 Va. 379, 382, 541 S.E.2d 899 (2001) ("For the doctrine of collateral estoppel to apply . . . the parties to the prior and subsequent proceedings, or their privies, must be the same"); *Angstadt v. Atlantic Mutual Ins. Co.*, 249 Va. 444, 446-47, 457 S.E.2d 86 (1995) ("For collateral estoppel to apply . . . the prior action must have resulted in a judgment that is valid, final, and against the party against whom the doctrine is sought to be applied.").

Next, the Foundation claims that under the Virginia Nonstock Corporation Act, Va. Code § 13.1-801 *et seq.*, Retreat's interest in Fund B belongs to the Foundation as Retreat's successor. That is not true. Virginia Code § 13.1-897(2), which is the section of the Act relied on by the Foundation, provides:

> The title to all real estate and other property owned by each corporation party to the merger shall be taken and deemed to be transferred to and vested in the surviving corporation without reversion or impairment.

Even if the above statute applies to undistributed proceeds of charitable trusts, something the Supreme Court of Virginia has not decided, it makes no difference. As has been said several times already, the court's decision in this

case is not based on any notion of property rights or succession of title. It is based on the fact that the condition placed on the beneficiary of Fund B by Wigington, the operation and maintenance of a hospital, must be respected. The Foundation does not operate or maintain a hospital. It is not a proper beneficiary of Fund B.

Finally, the Foundation submits that, if the court finds that the Foundation is not entitled to be the beneficiary of Fund B under the terms of the will, it should be designated as the beneficiary under the doctrine of *cy pres*. That doctrine has been codified in Virginia in Va. Code § 55-31, and provides:

> When any . . . person . . . bequeaths . . . or devises any real or personal property in trust to or for any . . . charitable . . . purpose, the indefiniteness or uncertainty of the beneficiaries named in any instrument creating such a . . . bequest . . . or devise . . . shall not defeat any such trust and, if the trust is in other respects valid under the laws of this Commonwealth, it shall be administered to conform as near as may be to the purpose for which created. . . . [U]nless the maker of the trust has specifically designated some other body, committee, agency, or entity to determine what that purpose shall be and to administer the trust (in which event the determination and administration by that body shall be valid), the determination of the purpose of the trust shall be made by a court of equity in the county or city wherein the property or the greater part thereof is located and the administration of the trust shall be under the direction of such court.

The court believes that the proper application of the *cy pres* doctrine in this case is to make Sheltering Arms the beneficiary of Fund B. The court reaches this conclusion because the testator expressly demonstrated a desire to have some of his money used to support the operation and maintenance of hospitals (Funds A and B) and some of his money used to help indigent people generally (Fund C). Since the fund that is now at issue is one of the funds designated to support the operation and maintenance of hospitals, it makes sense that it be transferred to the other fund that was established for the same purpose, especially since the new recipient is the recipient chosen by the testator for the other fund. While some other solution might also be acceptable, this solution is the most logical.

*Attorney's Fees and Expenses*

At the conclusion of oral argument, counsel raised a question about whether this court would determine Mattox' attorney's fees and expenses for bringing this action. The court will not make any ruling now. The court feels it is more appropriate to allow the commissioner of accounts to address that issue and, if any interested party wishes to challenge the commissioner's decision, it can be appealed to the court.